## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**EVA M. PATTERSON,**

        **Plaintiff,**      :

      **v.**

**EASTON MOTORCARS, LLC,**    :

        **Defendant.**

                **Case No. 2:19-cv-2944**
                **Judge Sarah D. Morrison**
                **Chief Magistrate Judge Elizabeth**
                **P. Deavers**

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment of Defendant Easton Motorcars, LLC ("Easton"). (Mot., ECF No. 53.) Plaintiff Eva M. Patterson responded (Resp., ECF No. 55), and Easton filed its reply (Reply, ECF No. 58). The Motion is now ripe for a decision.

Ms. Patterson was previously employed by Easton as a sales consultant. She filed this action alleging that Easton discriminated against her on the basis of sex, subjected her to *quid pro quo* sexual harassment and a hostile work environment, and intentionally inflicted emotional distress upon her. (Compl., ECF No. 3.) Easton moves for summary judgment on all claims. For the reasons set forth below, Easton's Motion is **GRANTED**.

## I.   FACTUAL BACKGROUND

Easton, a Kia dealership located in Columbus, Ohio, hired Ms. Patterson as a sales consultant on July 30, 2018. (Patterson Dep., ECF No. 50, 15:24–16:5.)

Easton's General Sales Manager Landon Bentley hired Ms. Patterson "after a 15-minute interview[.]" (*Id.*, 21:14–19; Santone Dep., ECF No. 49, 32:16–17, 75:4–6.) Mr. Bentley advised Ms. Patterson during the interview that sales consultants were expected to sell around twenty cars each month.[1] (Patterson Dep., 30:9:17.) Sales were tracked on a whiteboard in the dealership—"[i]t had everybody's name on it and everybody's sales . . . You would just add a mark for every new car [sold]." (*Id.*, 31:1–7.) Easton does not assign customers to its sales consultants; instead, whoever approaches a prospective customer first assists with the sale. (*Id.*, 102:16–17; Bentley Dep., ECF No. 51, 8:18.)

As an Easton sales consultant, Ms. Patterson reported to sales managers Landon Bentley and Alan Pecjak and finance manager, Robert DeBolt. (Patterson Dep., 33:13–17.) Messrs. Bentley, Pecjak, and DeBolt reported to general manager Paul Santone, who reported directly to Easton's owner, Joey Huang. (*Id.*, 34:1–11.)

Ms. Patterson was terminated just forty-four days after she was hired, on September 12, 2018. (*Id.*, 15:24–16:5.)

A.    **Sales Performance**

Before being allowed to sell cars, an Easton sales consultant must pass a series of online product knowledge tests, referred to as Kia University. (Patterson Dep., 36:9–14; Santone Dep., 16:8–13.) Ms. Patterson passed the Kia University

---

[1] Mr. Santone testified that new sales consultants are expected to sell only ten to twelve cars per month, but the expectation rises for individuals with prior car sales experience. (Santone Dep. 31:10–17.) Mr. Bentley also testified that new sales consultants are held to a lower standard than the more experienced, but he generally expected twenty sales each month. (Bentley Dep., 12:2–14.)

tests in three days, but "still wasn't allowed a sale until . . . [she] had been there for one week." (Patterson Dep., 96:12–97:5.) Ms. Patterson was eager to begin selling, however, and "begged" Mr. Bentley to "give [her] a sale." (*Id.*, 100:3–4.) Although Mr. Bentley does not recall delaying her first sale (Bentley Dep., 13:7–13), Ms. Patterson testified that he "kept stalling, in one way or another," saying "let's wait another day or two or maybe next week." (Patterson Dep., 100:6–7, 100:20–21.) In contrast, Ms. Patterson says that two male sales consultants, Tyler Gibbs and James Wilkerson, were allowed to begin selling "right away." (*Id.*, 97:6–11.) Although Ms. Patterson admittedly does not know when Messrs. Gibbs and Wilkerson completed Kia University, she noticed their first sales "recorded on the board, plain for everybody to see." (*Id.*, 97:14, 101:16–17.)

During her tenure at Easton, Ms. Patterson sold twelve cars—seven in August and five in September. (Patterson Dep. Ex. I.)

### B. Harassment

While employed there, Ms. Patterson was the only female sales consultant at Easton. (*Id.*, 42:21–22.) She describes the workplace culture as a "boy's club" atmosphere, with constant "locker room talk." (*Id.*, 42:14–22.) For example, on one occasion, Ms. Patterson overhead Mr. Bentley tell "several salespeople and a couple managers" that "women at the dealership were a pain in the ass, verbatim." (*Id.*, 54:17–23.)

Approximately two weeks into her tenure, Ms. Patterson began to experience sexual harassment from other Easton employees—namely, Steve Callum,[2] Robert DeBolt, and Mark Roberts.[3] (*Id.*, 39:15, 60:14–61:5.)

### 1. Steve Callum

On August 11, 2018, Mr. Callum, a fellow Easton sales consultant, was walking the car lot with Ms. Patterson when he told her, "you've got a really nice ass." (*Id.*, 40:8–10.) Ms. Patterson brought the comment to Mr. Pecjak's attention, who advised her to report to Mr. Santone immediately. (*Id.*, 44:6–14.) She did. (*Id.*, 44:16.) Mr. Bentley and Mr. Santone later met with Mr. Callum. (Santone Decl., ECF No. 53, PAGEID # 1119.) He admitted making the comment and was told that he could be fired for the conduct; that "[t]here's absolutely zero room for that" type of behavior. (*Id.*; Bentley Dep., 16:12–21.) Mr. Santone ultimately issued Mr. Callum a "final warning" (Easton's heaviest discipline short of termination) stating:

> We received notification that you inappropriately complimented a portion of a co-worker's body. This is notification that these types of actions are unacceptable in the workplace and should never occur again. This will serve as a warning and any further occurances [*sic*] will result in termination.

---

[2]In the parties' briefing and evidence, Mr. Callum is interchangeably referred to as Callum, O'Callum, and Steve O.

[3]Ms. Patterson's deposition is clear that there were only three individuals who harassed her. (Patterson Dep., 146:13–150:18.) In briefing, Ms. Patterson also complains that Easton management was aware that Todd Sherfey had inappropriate conversations with her in the workplace, yet took no action against him. (Resp., 19.) But Ms. Patterson did not identify Mr. Sherfey as a problem in her complaint, deposition, or elsewhere. (*See* Compl. *See also* Patterson Dep., 67:6–10.)

(Santone Decl,, PAGEID # 1119; Patterson Dep., Ex. L.)

Both Messrs. Bentley and Santone testified that they spoke with Ms. Patterson before meeting with Mr. Callum, and that she did not want him terminated. (Bentley Dep., 17:2–8.) Mr. Santone recalls that Ms. Patterson said she liked Mr. Callum, but "just do[es]n't want to be talked to like that." (Santone Dep., 57:18–20.) Although Ms. Patterson does not recall this conversation, she acknowledged that she "absolutely" did not want Mr. Callum to be fired. (Patterson Dep., 117:11–12.)

The following morning, Mr. Callum apologized to Ms. Patterson and shook her hand. (*Id*., 45:1–3.) In Ms. Patterson's view, "that was it as far as [they] were concerned." (*Id*.) She did not know that Easton took disciplinary action against Mr. Callum, but was satisfied with how the issue resolved. (*Id*., 45:3–11.) Mr. Callum never made another offensive comment to her. (*Id*., 60:17.)

Ms. Patterson further alleges that, on three or four occasions, Mr. Callum displayed pornography on his cell phone in front of her and other Easton employees. On each occasion, the material was visible for "a few seconds." (*Id*., 39:24.) At one point, Ms. Patterson "told [Mr. Callum] to get the fuck away . . . from [her] with that." (*Id*., 48:15–17.) Ms. Patterson thought it was known around the dealership that Mr. Callum was doing this because it was not unique to her; instead, Mr. Callum would "show [his phone] around." (*Id*., 46:3–5; 47:24–48:1.) As a result, she did not report the incidents. (*Id*., 46:18–22.)

Finally, Ms. Patterson testified that Mr. Callum engaged in "[c]onstant aggressive flirtation"—telling her she was "adorable" and that "if [he] wasn't married, stuff like that." (*Id.*, 41:12–16.) Though the conduct made Ms. Patterson uncomfortable, again she did not report it. (*Id.*, 42:18.)

### 2. Robert DeBolt

Roughly a week before she was terminated, Ms. Patterson was "standing outdoors having a smoke break" with Mr. DeBolt and "probably two or three other people." (*Id.*, 61:12–14.) Mr. DeBolt "simply turned to [her] and said, oh, baby, I had a dream about you last night, ooh wee." (*Id.*, 61:14–16.) Mr. DeBolt denies making any such comment. (DeBolt Dep., ECF No. 47, 20:9–21:7.) Ms. Patterson never reported the incident, and does not recall Mr. DeBolt doing anything else that she found offensive. (Patterson Dep., 62:3–7.)

### 3. Mark Roberts

Easton hired Mark Roberts as a sales manager on August 20, 2018. (Santone Decl., PAGEID # 1118.) Less than a week later, Mr. Roberts began asking Ms. Patterson on dates, and whispering to her that she was "adorable" and "cute." (Patterson Dep., 166:2–8.) Though made daily, Mr. Roberts's comments were not sexually explicit and no one else heard him. (*Id.*, 166:11–23.) The two also exchanged text messages. (Patterson Dep. Ex. Q.) Mr. Roberts's messages were undeniably flirtatious. (*Id.*) Though Ms. Patterson's could be read as reciprocally so, she maintains that she was trying only to "keep it polite" in order to preserve their working relationship. (*Id.*, 171:22–172:7.)

6

Accounting for his absence due to illness, Ms. Patterson worked with Mr. Roberts for only two weeks. (*Id.*, 180:5–6.) She never reported Mr. Roberts's conduct—she believes that, by the time his conduct rose to the level where she would have reported (*i.e.*, "[t]hat he asked [her] for nudes and that he offered to be [her] sugar daddy"), she had already been terminated. (*Id.*, 64:22–65:9.)

### C. Customer Service Issues

On September 10, 2018, Ms. Patterson was the subject of two separate customer complaints. (*Id.*, 181:20–22.) The first involved a customer she had taken on a test-drive. (*Id.*, 182:15–19.) The customer complained to Mr. Bentley that Ms. Patterson had been "rude." (*Id.*, 183:7–9.) He left the dealership upset and said that he would not buy a car from Easton again. (Santone Dep., 46:16–17, 47:24–48:3.) Mr. Bentley counseled Ms. Patterson about her behavior and told her "what you did to that guy was not okay." (Patterson Dep., 183:12–13.) The second incident involved a telephone call from a customer who wanted Ms. Patterson to give her a trade-in price for a vehicle, sight unseen. (*Id.*, 184:20–22.) When Ms. Patterson said she was unable to help, the customer "scream[ed]" at her. (*Id.*, 159:9–13.) She similarly reported that she would never deal with Easton again because of the way Ms. Patterson spoke to her. (Santone Dep., 47:21–23.) After the second complaint came in, Ms. Patterson was sent home. (Patterson Dep., 159:19.)

### D. Termination

After being sent home, Ms. Patterson expressed in text messages to Mr. Roberts that she was "worried about [her] job." (Patterson Dep. Ex. Q, 99.) She

acknowledged that she "ha[d]n't sold a thing in 5 days" and described the situation

as "[d]ire." (*Id.*, 104.) In deposition, Ms. Patterson testified that she felt

> in danger of getting the come to Jesus talk, but I didn't think I was going
> to get fired. Or at least hoping I wasn't going to get fired. I was worried
> at that point because I wanted better numbers.

(Patterson Dep., 187:9–14.)

On September 12, 2018, Mr. Bentley fired Ms. Patterson. (Bentley Dep.,

30:2–5.) After calling Ms. Patterson into his office, Mr. Bentley said only that "I'm

sorry, Eva, it's just not working out." (Patterson Dep., 203:16–17.) Mr. Bentley

provided no other specifics, and "off [Ms. Patterson] went." (*Id.*, 203:17–23.)

## II.    PROCEDURAL BACKGROUND

Ms. Patterson filed a charge with the Equal Employment Opportunity

Commission and received a Right to Sue letter dated March 19, 2019. (Compl.,

PAGEID # 27.) She then filed this action, asserting the following four claims

against Easton: Sex discrimination under Title VII (Count I); Sex discrimination

under Ohio Revised Code Chapter 4112 (Count II); *Quid Pro Quo* Sexual

Harassment (Count III); and Intentional Infliction of Emotional Distress (Count IV).

(*Id.*, *generally*.)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine

issues of material fact, which may be achieved by demonstrating the nonmoving

party lacks evidence to support an essential element of its claim. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

## IV.   ANALYSIS

### A.   Counts I and II: Federal and State Sex Discrimination

In Counts I and II, Ms. Patterson claims that Easton violated federal and state law by discriminating against her on the basis of sex, including by subjecting her to a hostile work environment.

Under federal law, it is illegal "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Similarly, Ohio law provides that:

> [i]t shall be an unlawful discriminatory practice . . . [f]or any employer,
> because of the race, color, religion, sex, national origin, handicap, age,
> or ancestry of any person, . . . to discriminate against that person with
> respect to hire, tenure, terms, conditions, or privileges of employment,
> or any matter directly or indirectly related to employment.

Ohio Rev. Code § 4112.02(A). The Sixth Circuit has recognized that "the elements and

legal standards for establishing unlawful sex discrimination are the same under Ohio

Rev. Code § 4112.02 and under 42 U.S.C. § 2000e—2[.]" *Laderach v. U-Haul*, 207 F.3d

825, 828 (6th Cir. 2000). Accordingly, the Court will address these claims together.

### 1.    Intentional Sex Discrimination

A plaintiff can prove unlawful conduct through either direct or circumstantial

evidence. Direct evidence is evidence "which, if believed, requires the conclusion

that unlawful discrimination was at least a motivating factor in the employer's

actions." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921,

924 (6th Cir. 1999). In the absence of direct evidence of discrimination, such claims

are analyzed under the *McDonnell Douglas* burden-shifting framework. *White v.*

*Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), as modified by *Texas Dep't of*

*Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under this approach, a plaintiff

must first establish a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252–

53. Establishing a *prima facie* case creates a rebuttable presumption that the

employer engaged in unlawful conduct. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).

Once the plaintiff has established a *prima facie* case, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the adverse employment action. *Burdine*, 450 U.S. at 252–53. The burden is not onerous. An employer will satisfy its burden as long as it articulates a valid rationale for its decision. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996).

If a defendant presents a legitimate, non-discriminatory reason for the employment action, "a plaintiff will survive summary judgment only by raising a genuine issue of material fact as to whether the proffered reason is in fact a pretext for" unlawful discrimination. *Walcott v. City of Cleveland*, 123 F. App'x 171, 176 (6th Cir. 2005). To establish pretext, a plaintiff must show that "the reason offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the decision . . . or (3) was insufficient to warrant the decision . . . ." *Id*. "In every civil rights action it is the responsibility of the jury [to] determine whether the defendant's actions were invidious, pretextual, or improperly motivated." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000). The ultimate burden of persuasion remains throughout this analysis on the plaintiff. *See Burdine*, 450 U.S. at 253.

### a) Ms. Patterson has made a *prima facie* showing of intentional discrimination.

Ms. Patterson does not offer direct evidence of sex discrimination. The Court therefore utilizes the familiar *McDonnell Douglas* burden-shifting framework to evaluate her claims. *White*, 533 F.3d at 391 (citing *McDonnell*

*Douglas*, 411 U.S. at 802, as modified by *Burdine*, 450 U.S. 248 (1981)). Ms. Patterson may establish a *prima facie* case of intentional discrimination by showing that (i) she was a member of a protected class, (ii) she was qualified for her position, (iii) she suffered an adverse employment action, and (iv) she was treated differently than a similarly situated employee who was not a member of the protected class. *Id.*

Easton concedes that Ms. Patterson meets the first three elements of her *prima facie* case, but argues that she cannot establish the fourth. (Mot., 24.) Ms. Patterson, in turn, identifies two male Easton sales consultants whom she alleges were treated better: Tyler Gibbs and James Wilkerson. (Resp., 10–11.)

To demonstrate disparate treatment, a plaintiff must identify evidence that tends to show that she is similarly situated in all relevant respects to the employees to whom she compares herself. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "[T]o be deemed 'similarly-situated' in the [context of disciplinary action resulting in termination of employment], 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* at 353 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Here, Messrs. Gibbs and Wilkerson dealt with the same supervisors, were subject to the same sales standards, and had the same job duties as Ms. Patterson. (Resp., 11.) Easton

argues that the two men were not similarly situated because, unlike Ms. Patterson, they had no prior car sales experience. (Mot., 4; Reply, 3.) Easton's argument strains credulity. Ms. Patterson's "prior car sales experience" was, in truth, a one-month stint at an Audi dealership. (Patterson Dep., 17:18–18:14.) This limited experience fails to distinguish Ms. Patterson from her two male colleagues.

Ms. Patterson argues that Messrs. Gibbs and Wilkerson were treated more favorably in two ways: First, that the two men were allowed to sell cars immediately upon hire, where she was made to sit idle for a week; and second, that, in their first 30 days, Ms. Patterson sold more cars than Mr. Gibbs and sold the same number of cars as Mr. Wilkerson, yet she was terminated for poor sales and they were not. (Resp., 11.)

As to her first argument, the Court finds that the alleged one-week hold-back from the sales floor does not constitute an adverse employment action as a matter of law. "An adverse employment action is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White*, 533 F.3d at 402 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). Despite the great lengths to which Ms. Patterson goes to persuade the Court that she was kept off the sales floor for a week, while Mr. Gibbs "may have sold his first car on his second or third day [of employment], and [Mr. Wilkerson] was right in there, first or second day, as well[,]" (Patterson

13

Dep., 97:8–11), such a minimal delay does not constitute a significant change in employment status. As a basis for Ms. Patterson's sex discrimination claim, it fails.

As to Ms. Patterson's second argument, she has established a *prima facie* case. The parties each offer a self-serving interpretation of the sales records for Ms. Patterson, Mr. Gibbs, and Mr. Wilkerson. (*Compare* Resp., 3, 7 *and* Reply, 2–3.) But the record reveals: In the month[4] preceding her termination, Ms. Patterson sold twelve cars. (ECF No. 55-6, PAGEID # 1194.) Over that same month[5], Mr. Gibbs sold twelve cars. (ECF No. 55-4, PAGEID # 1192.) And in Mr. Wilkerson's first month[6] of sales activity, he, too, sold twelve cars. (ECF No. 55-5, PAGEID # 1193.)

Easton argues that the more appropriate comparison is between Ms. Patterson's total sales, and Messrs. Gibbs's and. Wilkerson's total sales during their first forty-five days of employment—twelve, seventeen, and fifteen cars, respectively. (Reply, 3.) In Easton's view, these "close" figures are "not enough to be considered 'similarly-situated.'" (*Id*.) The law does not take such a rigid view. *See Ercegovich*, 154 F.3d at 352 ("The plaintiff need not demonstrate an <u>exact</u> correlation with the employee receiving more favorable treatment in order for the two to be considered similarly-situated; rather. . . the plaintiff and the [comparator] must be <u>similar</u> in all of the relevant aspects.") (emphasis added; original emphasis

---

[4] August 12, 2018, to September 12, 2018.

[5] August 12, 2018, to September 12, 2018.

[6] August 23, 2018, to September 23, 2018. Mr. Wilkerson was hired on August 20, 2018, and made his first sale on August 23, 2018.

omitted) (internal quotations and citation omitted). Easton also points to Ms. Patterson's contemporaneous text messages and deposition testimony indicating that she was worried about her sales performance, and "wanted better numbers." But, of course Ms. Patterson—a salesperson—wanted to make more sales. Her statements are not reasonably interpreted as any kind of concession as to the righteousness of her termination.

Viewing the evidence in the light most favorable to Ms. Patterson, she has made a *prima facie* case for discrimination on the basis of sex.

### b) Easton offers a legitimate, non-discriminatory reason for terminating her employment.

Because Ms. Patterson has satisfied her *prima facie* burden, the burden shifts to Easton to offer a legitimate, nondiscriminatory reason for her termination. *Provenzano v. LCI Holding, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citation omitted). Their burden is one of production, not persuasion; it "can involve no credibility assessment." *St. Mary's Honor Ctr.*, 509 U.S. at 509.

Easton meets its burden by stating that it terminated Ms. Patterson's employment for two legitimate reasons: poor sales and customer complaints. (Mot., 25.) "Poor performance is a legitimate non-discriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental Ctr., P.C.,* 480 F.3d 791, 802 (6th Cir. 2007) (citation omitted).

### c)    Ms. Patterson fails to show that Easton's stated reason is mere pretext for discrimination.

To defeat the Motion, Ms. Patterson must show that a genuine issue of material fact exists as to whether Easton's proffered reasons were pretext for discrimination. To do so, she may establish that Easton's proffered reasons: (i) had no basis in fact; (ii) did not actually motivate the employer's action; or (iii) were insufficient to motivate the employer's action. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012)). These three categories are a "convenient way of marshaling evidence and focusing it on the ultimate inquiry: 'did the employer fire the employee for the stated reason or not?'" *Id.*

A jury "may not reject an employer's explanation [of its action] unless there is sufficient basis in the evidence for doing so." *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 600 (6th Cir. 2001) (quotation and citation omitted). Accordingly, to avoid summary judgment, "a plaintiff must produce sufficient evidence from which a jury could reasonably reject the defendant's explanation of why it fired her." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). The evidence must suggest that the employer acted for discriminatory reasons—more than simply revealing "a dispute over the facts upon which the discharge was based[.]" *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v.*

*Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (citation omitted).

Ms. Patterson argues that Easton's stated reasons for terminating her are pretext for discrimination. She offers two arguments in support: first, that the sales performance justification has no basis in fact; and, second, that Easton's proffered reason for terminating her has shifted over time. (Resp. 7–8, 12–15.)

As to her first argument, Ms. Patterson misconstrues the law governing her burden on establishing pretext. Ms. Patterson must put forth evidence that Easton did not "honestly believe" in the given reason for her termination. She has not done so. Instead, she has shown that the parties "dispute . . . the facts upon which the discharge was based." *Braithwaite*, 258 F.3d at 494. As discussed above, the sales data can be read and interpreted in several ways. Easton looks at Ms. Patterson's entire tenure to determine her sales record, as opposed to her final thirty days. Ms. Patterson worked at Easton for forty-four days, during which time she sold twelve cars. By comparison, Mr. Gibbs sold seventeen cars, and Mr. Wilkerson sold fifteen, in their first forty-five days. Ms. Patterson offers no evidence suggesting that Easton did not honestly rely on this analysis to determine that her sales were not meeting expectations.

Moreover, Easton maintains that Ms. Patterson's record of customer complaints also factored into the decision to terminate her employment. It is undisputed that two separate customers complained to Easton management about Ms. Patterson on the same day—two days before she was terminated. Though Ms.

17

Patterson downplays the significance of those complaints now, she described the situation as "dire" at the time. She offers similarly sparse evidence to suggest that Easton did not honestly rely on her complaint record in deciding to terminate her.

That leads directly to Ms. Patterson's second argument: that Easton's purportedly late addition of customer complaints to the list of reasons justifying her termination shows that the reasons are mere pretext. Mr. Bentley terminated Ms. Patterson on September 12, 2018—two days after she was sent home due to customer complaints. Mr. Bentley gave no specific reason, but told Ms. Patterson "it's just not working out." (Patterson Dep., 203:16–17.) Easton later represented to the EEOC that Ms. Patterson was terminated "due to job performance." (ECF No. 55-9, PAGEID # 1261.) Easton now represents that she was terminated for poor sales and customer complaints—both of which relate to job performance. (*See* Bentley Dep., 30:3–5.)

While <u>different or shifting</u> justifications for an adverse employment action may show pretext, *see Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 587 (6th Cir. 2002), it is well-established that providing <u>additional, consistent</u> reasons justifying the action does not generally raise any such inference, *Alexander v. Ohio State Univ. Coll. of Soc. Work,* 429 F. App'x 481, 489–90 (6th Cir. 2011), *cert. denied*, 565 U.S. 979 (2011). *See also MacDonald-Bass v. J.E. Johnson Contracting, Inc.*, 493 F. App'x 718, 726 (6th Cir. 2012) ("[P]roviding *additional* non-discriminatory reasons that do not conflict with the one stated at time of discharge does not constitute shifting justifications."); *Tidwell v. Carter Prods.,* 135 F.3d 1422, 1428 (11th Cir.

18

1998) (noting that "the existence of a possible additional non-discriminatory basis for [plaintiff's] termination does not . . . prove pretext"). Easton has consistently maintained that Ms. Patterson was terminated for her poor job performance. Both sales records and customer service are components of an Easton sales consultant's job performance. (Santone Dep., 40:17–41:7.) The fact that Easton now specifies that customer complaints factored into its decision does not make a shifting explanation, and fails to raise an inference of pretext.

Further weakening the argument that Easton's stated reasons were mere pretext for discrimination is the fact that the same person who fired Ms. Patterson—Mr. Bentley—had hired her just forty-four days earlier. Thus, the same-actor inference is relevant. *See Cutcliffe v. Wright State Univ.*, 2019 WL 316909 (S.D. Ohio Jan. 24, 2019) (Rose, J.) (applying the same-actor inference when the hire and fire decisions were made fifteen months apart). Though the same-actor inference is neither mandatory nor dispositive, it can weaken evidence of discrimination. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 573–74 (6th Cir. 2003) (en banc) (holding that the same-actor inference is "insufficient to warrant summary judgment for the defendant if the [plaintiff] has otherwise raised a genuine issue of material fact" as to discriminatory intent). It would certainly cut against the same-actor inference if evidence established that Mr. Bentley indeed expressed a belief that "women at the dealership were a pain in the ass[.]" (Patterson Dep., 54:17–18.) But, outside of Ms. Patterson's, the issue was never raised in deposition, and Ms. Patterson herself described the statement as being

made "in jest[,]" that it "was giggle giggle, ha ha." (*Id.*, 55:8–11.)

Ms. Patterson has failed to present any evidence upon which a reasonable jury could determine that Easton's stated reasons for terminating her were mere pretext for discrimination. Accordingly, Easton's motion for summary judgment on her intentional sex discrimination claims is **GRANTED**.

### 2.    Hostile Work Environment

Ms. Patterson also alleges that she suffered as a result of Easton's sexually hostile work environment. To succeed on such a claim, a plaintiff must establish that: (i) she is a member of a protected class; (ii) she was subjected to unwelcome sexual harassment; (iii) the harassment complained of was based on sex; (iv) the harassment had the effect of unreasonably interfering with her work performance and created a working environment that was intimidating, hostile, or offensive; and (v) a basis for employer liability exists. *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 49 (6th Cir. 1996), *cert. denied*, 519 U.S. 863 (1996). Ms. Patterson has not established the fourth element of her claim. Accordingly, the Court need not and does not address the remaining elements.

The fourth element of a hostile work environment claim encompasses both objective and subjective components. That is, "the conduct must be severe enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The objective component requires courts to

consider "whether the workplace is so permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Grace v. USCAR*, 521 F.3d 655, 678–79 (6th Cir. 2008) (internal quotation marks and citation omitted). The review encompasses "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance." *Harris*, 510 U.S. at 23. Case law sets "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Philips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) (noting that, in many cases, overtly discriminatory statements and racial slurs did not create an actionable hostile work environment). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (cleaned up) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Conduct that is merely offensive is not actionable" as a hostile work environment claim; "the harassment must consist of more than words that simply have sexual content or connotations." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted). "[S]exual comments and harassing acts of a 'continual' nature are more likely to be deemed pervasive." *Id.* (quoting *Abeita v. TransAm. Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998)).

In this case, there is no evidence that the harassment Ms. Patterson alleges was physically threatening or humiliating. And, while she recounts incidents of decidedly inappropriate workplace behavior, those incidents were isolated and, on the spectrum of such behavior, relatively tame.

- As to Mr. Callum, he told Ms. Patterson that she "had a really nice ass," and was subsequently disciplined and apologized. Ms. Patterson was satisfied with how the issue was resolved. Mr. Callum also flirted with Ms. Patterson and displayed pornography on his cell phone to coworkers, including Ms. Patterson, "[t]hree or four times." Mr. Callum did not single out Ms. Patterson as a target for these 'porn bombs'—instead, "[h]e showed it around." In response, Ms. Patterson "told him to get the fuck away . . . from [her] with that."

- As to Mr. DeBolt, on one occasion, he told Ms. Patterson that he had dreamt about her. Though ripe for innuendo, there was nothing explicit in his one-time statement.

- Finally, Mr. Roberts asked Ms. Patterson on dates, made comments about her appearance, and exchanged flirtatious text messages with her. Avoiding unwanted advances and commentary on her appearance—as Ms. Patterson describes it, "the avoidance game"— would certainly make selling cars more challenging. (*Id.*, 211:10–15.) However, Ms. Patterson's tenure overlapped with Mr. Roberts's by only

two weeks, during which time he was "hardly there to begin with
because of his health issues." (*Id.*, 157:12–13.)

Even considering these incidents in combination, they fall short of the severe and
pervasive harassment redressable under a hostile work environment claim. *See,
e.g., Stacy v. Shoney's, Inc.,* No. 97-5393 142 F.3d 436 (table) (6th Cir. 1998) (finding
that a male supervisor's sexual comments, leering, and inappropriate behavior over
a two-month period were insufficient to establish a hostile work environment);
*Stevens v. St. Elizabeth Med. Ctr. Inc.*, 533 F. App'x 624 (6th Cir. 2013) (affirming
grant of summary judgment for defendants on hostile work environment claim
despite inappropriate texts and unwanted physical contact); *Black v. Zaring Homes,
Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (reversing jury verdict for plaintiff where
conduct, including off-color jokes and mysoginistic comments, "does not appear to
have been more than 'merely offensive'").

Ms. Patterson fails to clear the "high bar" established by law. Accordingly,
there is no genuine issue of material fact for trial. Easton's motion for summary
judgment on Ms. Patterson's hostile work environment claims is **GRANTED**.

### B.    Count III: Quid Pro Quo Harassment

Ms. Patterson concedes that she has failed to demonstrate *quid pro quo*
harassment, and that Easton is entitled to summary judgment on this claim. (Resp.,
2). Accordingly, Easton's motion is **GRANTED** as to Count III.

### C.    Count IV: Intentional Infliction of Emotional Distress

Ms. Patterson's final claim is for intentional infliction of emotional distress

("IIED") under Ohio law. An IIED claim requires proving

> (1) that the actor either intended to cause emotional distress or knew or
> should have known that the actions taken would result in serious
> emotional distress to the plaintiff, (2) that the actor's conduct was so
> extreme and outrageous as to go beyond all possible bounds of decency
> and was such that it can be considered as utterly intolerable in a
> civilized community, (3) that the actor's actions were the proximate
> cause of the plaintiff's psychic injury, and (4) that the mental anguish
> suffered by the plaintiff is serious and of a nature that no reasonable
> man could be expected to endure it.

*Ondo v. City of Cleveland*, 795 F.3d 597, 611–12 (6th Cir. 2015) (quoting *Burkes v.*

*Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. Nov. 13, 1995)). The "extreme and

outrageous" standard is narrowly defined and is difficult to meet. *Id*. at 612. The Ohio

Supreme Court has described it as follows:

> Liability has been found only where the conduct has been so outrageous
> in character, and so extreme in degree, as to go beyond all possible
> bounds of decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community. Generally, the case is one in which
> the recitation of the facts to an average member of the community would
> arouse his resentment against the actor, and lead him to exclaim,
> "Outrageous!"
>
> The liability clearly does not extend to mere insults, indignities, threats,
> annoyances, petty oppressions, or other trivialities. The rough edges of
> our society are still in need of a good deal of filing down, and in the
> meantime plaintiffs must necessarily be expected and required to be
> hardened to a certain amount of rough language, and to occasional acts
> that are definitely inconsiderate and unkind. There is no occasion for
> the law to intervene in every case where some one's feelings are hurt.

*Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*,

453 N.E.2d 666, 671 (Ohio 1983) (quoting Restatement (Second) of Torts § 46 cmt. d

(Am. Law Inst. 1965)), *abrogated on other grounds by Welling v. Weinfeld*, 866

N.E.2d 1051 (Ohio 2007). *See also Brown v. Denny*, 594 N.E.2d 1008, 1012 ("[N]ot

every wrongful act is outrageous. Only the most extreme wrongs, which do gross

24

violence to the norms of a civilized society, will rise to the level of outrageous conduct.").

Easton argues that the conduct that occurred here was not "extreme and outrageous." (Mot., 28.) The Court agrees. Viewing the evidence in the light most favorable to Ms. Patterson, the Court finds that no reasonable jury could conclude that the conduct at issue is extreme and outrageous. "Even if based upon discrimination, an employee's termination does not rise to the level of 'extreme and outrageous conduct.'" *Genco v. YWCA of Greater Cincinnati, Inc.*, No. 1:17-0462 (WOB), 2018 WL 4008051, at *4 (S.D. Ohio Aug. 22, 2018) (Bertelsman, J.) (citing *Godfredson v. Hess & Clark, Inc.,* 173 F.3d 365, 376 (6th Cir. 1999). *See also Cameron v. Bd. of Educ. of Hillsboro, Ohio City Sch. Dist.,* 795 F. Supp. 228, 238 (S.D. Ohio 1991) (Spiegel, J.) (rejecting plaintiff's IIED claim where only basis for emotional distress was that she "may have been dismissed for discriminatory reasons"). What's more, "even sexually charged and lewd comments by a supervisor or fellow employee does not rise to the level of 'outrageous conduct.'" *French v. U.S.*, 195 F. Supp. 3d 947, 956 (N.D. Ohio 2016) (collecting cases).

Ms. Patterson has not provided the Court with any case law producing a finding otherwise on analogous facts. Her invocation of *Hampel*—a case in which the facts and procedural posture are entirely distinguishable—is not persuasive. Although the *Hampel* court indeed stated that "relevant evidence . . . presented in support of sexual harassment" may also be "relevant and admissible with regard to [IIED]," the court in the same breath recognized that the "elements of a sexual

25

harassment claim and an [IIED] claim are substantively different and conclusions relating to the liability of one do not transfer to another." *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 740 (Ohio 2000) (affirming trial court's decision to enter a directed verdict for defense on sexual harassment claim, while leaving verdict for plaintiff on IIED; facts giving rise to claims reflect sustained and targeted harassment of a subordinate by a superior and possible retaliation for reporting incident to management).

Accordingly, the Court **GRANTS** Easton's motion for summary judgment on Count IV.

## V.    CONCLUSION

For the reasons set forth above, Easton's Motion for Summary Judgment (ECF No. 53) is **GRANTED**. The Clerk is **DIRECTED** to **TERMINATE** this case from the docket of the United States District Court for the Southern District of Ohio.


**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**